IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MOHAMMAD ZAKI AMAWI, ) | |
| 30547-160, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:13-cv-00866-JPG-RJD |
| ) | |
| J.S. WALTON, D. SCOTT DODRILL, ) | |
| BRIAN K. DAVIS, LESLIE SMITH, ) | |
| HARLEY LAPPIN, ERIC HOLDER, ) | |
| THOMAS R. KANE, CHARLES ) | |
| SAMUELS, JR., MICHAEL K. NALLEY, ) | |
| PAUL M. LAIRD, AMBER NELSON, ) | |
| D. SCHIAVONE, APRIL CRUITT, ) | |
| WILLIAM FALLS, J. SIMMONS, ) | |
| T. CAPALDO, STEPHEN COLT, ) | |
| WENDY J. ROAL, LISA J. ) | |
| HOLLINGSWORTH, JOHN PARENT, ) | |
| STEVE JULIAN, DAN SPROUL, ) | |
| CALVIN JOHNSON, JEFF BANEY, ) | |
| PAUL KELLY, STEVEN CARDONA, ) | |
| M. NUEMANN, G. BURGESS, ) | |
| LAWRENCE HOWARD, E. GARCIA, ) | |
| HENRY RIVAS, FEDERAL BUREAU ) | |
| OF PRISONS and JOYCE CONLEY, ) | |
| ) | |
| Defendants. ) | |

**REPORT AND RECOMMENDATIONS**

**DALY, Magistrate Judge:**

This is a prisoner civil rights lawsuit arising out of plaintiff Mohammad Zaki Amawi's placement in the United States Penitentiary Marion ("USP-Marion") "Communications Management Unit" ("CMU"). The CMU is a "self-contained unit" within USP-Marion for "high risk inmates." (Doc. 176, p. 4). CMUs are designed to "enabl[e] [prison] staff to more effectively monitor communication between inmates in CMUs and persons in the community." 28 C.F.R. § 540.200(c). The Federal Bureau of Prisons ("BOP") regulations establish special placement

1

criteria for CMU transfers. 28 C.F.R. § 540.201. Examples of such criteria include inmates who have been convicted of a terrorism related offense or where there is a "substantial likelihood" that the inmate will continue to organize criminal activity while incarcerated. *Id*. The BOP operates two CMUs; one at USP-Marion and the other at Federal Correctional Institution Terre Haute.

Amawi asserts in his complaint that his placement in the CMU violated his constitutional rights and that the BOP's implementation of the CMU program has been unlawful. After filing suit Amawi's complaint was screened by Judge Gilbert pursuant to 28 U.S.C. § 1915A. (Doc. 8). In the screening order, Judge Gilbert held that Amawi articulated the following claims:

> **Count 1:** Procedural due process claim against all the individual Defendants (but not against Defendant BOP), for placing and retaining Plaintiff in the CMU, and denying his requests for transfer;
>
> **Count 2:** Equal protection claim against all the individual Defendants (but not against Defendant BOP), for designating Plaintiff for placement in the CMU based on his race and religion;
>
> **Count 3:** Violation of the Administrative Procedure Act, against Defendant Bureau of Prisons and all individual Defendants.

*Id*. Count 3 was later dismissed (along with the BOP as a defendant) for failure to exhaust administrative remedies. (See Doc. 172). Amawi currently proceeds solely on the first two counts. The defendants now seek summary judgment. (Doc. 176). For the following reasons, the defendants' motion for summary judgment should be granted.

## I. BACKGROUND

According to the record in Amawi's criminal case, shortly after the events of September 11, 2001, the FBI assigned a paid informant to go undercover within the Toledo, Ohio Muslim community. *United States v. Amawi*, 695 F.3d 457, 466.[1] The informant and Amawi met at one of the local mosques and became acquaintances. *Id*. They later travelled to Jordan together in 2005 in an attempt to provide support to jihadist groups fighting American forces in Iraq. *Id*. In February of 2006 FBI agents arrested Amawi in Jordan and brought him back to the United States. *Id*. At the conclusion of his 2008 criminal trial Amawi was convicted of conspiracy to kill and maim persons outside of the United States in violation of 18 U.S.C. 956(a)(1), conspiracy to provide material support to terrorists in violation of 18 U.S.C. 2339A, and two counts of "distribution of information relating to explosives, destructive devices, and weapons of mass destruction" in violation of 18 U.S.C. § 842(p)(2)(A). *Id*. at 465. In 2009 he was sentenced to 240 months in prison and a term of life supervision following his release. (Doc. 176-2, pp. 1-2). Amawi's prison term is set to end on February 20, 2026 and he has a good conduct release date of August 29, 2023. (Doc. 176-2, p. 2).

Following his arrest, Amawi was housed at Federal Correctional Institution Milan ("FCI-Milan"). Amawi stayed at FCI-Milan through trial and sentencing. He was then transferred to the USP-Marion CMU on January 5, 2010. (Doc. 176-1, p. 5). Upon arrival Amawi received a formal written notice from the BOP regarding his CMU designation. (Doc. 1-1, p. 4). The notice explained that his communications at the CMU may be monitored and limited. *Id.* It also described the reasons for the transfer:

---

[1] This Court takes judicial notice of Amawi's underlying criminal proceedings. See *Green v. Warden, U.S. Penitentiary*, 699 F.2d 364, 369 (7th Cir. 1983). ("federal courts may also take notice of proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue").

> Your transfer to this facility under these conditions is based on the following specific information:
>
> Your current offenses of conviction are for Conspiracy to Kill, Kidnap, Maim or Injure Persons Outside of the United States; Conspiring to Provide Material Support to Terrorists; and Distributing Information Regarding Explosives. Your offense conduct included the use of communication codes to disguise and conceal the true subject and purpose of communications over the internet and in e-mail messages. Your institution conduct included the circumvention of telephone monitoring regulations through third party communications during approved attorney-client calls. Your contact with persons in the community requires heightened controls and review.

(Doc. 1-1, p. 4). Additionally, the notice explained that duration of his sentence will not be affected by the CMU placement and that his CMU designation will be regularly reviewed. *Id*. The BOP did not hold a hearing on the transfer, but the notice informed Amawi that he could appeal his CMU designation through the BOP administrative remedies process. *Id*.

The purpose and general operational practices of CMUs are set forth in BOP regulations at 28 C.F.R. § 540.200, *et seq*. Simply put; "A CMU is a general population housing unit where inmates ordinarily reside, eat, and participate in all educational, recreational, religious, visiting, unit management, and work programming, within the confines of the CMU." 28 C.F.R. § 540.200(b). This environment "enables staff to more effectively monitor communication between inmates in CMUs and persons in the community." 28 C.F.R. § 540.200(c). BOP regulations list special criteria to determine which inmates are suitable for CMU placement. The criteria include inmates who have been convicted of a terrorism related offense, inmates who are likely to orchestrate criminal activities while incarcerated, and inmates who have abused or

misused approved communications methods while incarcerated, among other criteria. 28 C.F.R. § 540.201.[2]

The key characteristic of CMUs, as the name suggests, is that inmates placed there are subject to having their communications strictly limited and monitored. Pursuant to BOP regulations, general written correspondence (not including legal mail) may be limited to six pages per week, 28 C.F.R. § 540.203(a), and telephone communications (not including attorney calls) may be limited to three 15 minute calls per week. 28 C.F.R. § 540.204(a). Telephone calls are also subject to monitoring and may only be placed to immediate family members. *Id*. For in-person visits, inmates may be limited to four – one hour, no contact visits per month. *Id*. Additionally, visits may be restricted to immediate family members and subject to audio visual recording. *Id*. Amawi mentions in his response to the defendants' motion for summary judgment that he was actually subjected to stricter limitations in the USP-Marion CMU. (Doc. 190, p. 5). He states that he was only allowed one 15 minute phone call per week (and he had to provide a one week notice beforehand so that each call could be approved) and that he was only allowed two, four hour visits per month. *Id.*

Amawi notes in his complaint that the overall conditions in the CMU were more restrictive than the conditions in general population. For instance, CMU inmates are provided

---

[2] BOP regulations state:
    Inmates may be designated to a CMU if evidence of the following criteria exists:
    (a) The inmate's current offense(s) of conviction, or offense conduct, included association, communication, or involvement, related to international or domestic terrorism;
    (b) The inmate's current offense(s) of conviction, offense conduct, or activity while incarcerated, indicates a substantial likelihood that the inmate will encourage, coordinate, facilitate, or otherwise act in furtherance of illegal activity through communication with persons in the community;
    (c) The inmate has attempted, or indicates a substantial likelihood that the inmate will contact victims of the inmate's current offense(s) of conviction;
    (d) The inmate committed prohibited activity related to misuse or abuse of approved communication methods while incarcerated; or
    (e) There is any other substantiated/credible evidence of a potential threat to the safe, secure, and orderly operation of prison facilities, or protection of the public, as a result of the inmate's communication with persons in the community.
28 C.F.R. § 540.201.

fewer job opportunities and not allowed to have UNICOR (prison industries) or trade type jobs. (Doc. 1, p. 14). Moreover, the jobs available to CMU inmates pay less than those available in general population. *Id*. Amawi also states in his complaint that inmates in the CMU are not allowed access to the mailroom and that they only interact with executive staff members once per week. *Id*.

Sometime after arrival, Amawi requested to be transferred out of the CMU. Amawi states that defendants Rivas, Kelly and Neumann all told him that "as long as you live and serve your sentence you will never leave the CMU. We don't need any more Muslims in general population to radicalize anyone." (Doc. 190, p. 5). Additionally, defendant Dodrill told defendant Neumann that "Amawi will never leave the CMU." *Id*. Amawi also notes that the defendants "continued to tell the Plaintiff that he would stay in CMU as long as he was a Muslim, and that was the real reason why the Plaintiff was designated to the CMU." (Doc. 190, p. 6).

While in the CMU, Amawi pursued redress through the BOP administrative remedies process. Amawi contested his CMU designation and he asserted that the BOP discriminates against Muslim inmates through its "Controlled Units" (i.e., CMUs, Special Housing Unit or "SHU" disciplinary segregation type units and "SMUs" or Special Management Units) procedures. (Doc. 1-1, p. 3). Amawi also requested a due process hearing and an investigation into CMU practices. *Id*. The BOP ultimately denied his grievance. *Id*. On August 25, 2014 Amawi was transferred out of the USP-Marion CMU and to the Special Management Unit ("SMU") in Lewisburg, Pennsylvania. (Doc. 176-1, p. 5).

The defendants dispute Amawi's assertions that the BOP is discriminatory towards Muslim inmates. Attached to the defendants' motion for summary judgment is the declaration of Gary Burgess, an employee at USP-Marion. (Doc. 176-2, p. 1). His position is Case Manager of

6

the CMU. *Id*. Burgess states in his declaration that Amawi's disciplinary record from 2006 through March of 2014 includes 68 incident reports. (Doc. 176-2, p. 2). Prior to his transfer to USP-Marion, Amawi received incident reports for insolence, assault, and abusing telephone privileges. (Doc. 176-2, pp. 3-22). Additionally, Burgess states in his declaration that as of March 26, 2014, there were 95 inmates in total assigned to the two CMUs in Marion and Terre Haute. (Doc. 176-2, p. 2). Of those 95 inmates, 45 identified as Muslim, including Amawi. *Id*.

Also attached to the defendants' motion for summary judgment is the declaration of David Schiavone, Senior Intelligence Analyst for the BOP's Counter Terrorism Unit ("CTU"). (Doc. 176-1, pp. 1-6). Schiavone states in his declaration that he "provide[s] oversight and guidance as a subject matter expert for the BOP regarding the Communication Management Units (CMUs) [.]" (Doc. 176-1, p. 2). He also "review[s] intelligence for inmate offenders for possible referral to a CMU; prepare[s] requests for designation to and redesignations from the CMUs; and manage[s] the collection, analysis, and dissemination of operational and strategic intelligence as it relates to the CMUs." *Id*.

In his declaration, Schiavone describes the process in which inmates are recommended and approved for CMU placement. First, the BOP (the BOP CTU, specifically) receives information relevant to determine whether an inmate should be placed in a CMU.[3] (Doc. 176-1, pp. 3-4). The CTU reviews this information and issues a recommendation for CMU placement.

---

[3] According to Schiavone's declaration, the BOP CTU reviews the following information in determining whether to recommend an inmate for CMU placement:
      a. Pre-sentence investigation report
      b. Judgment in a criminal case
      c. Statement of Reasons
      d. DHO reports relevant to referral, such as communication-related misconduct;
      e. Relevant Special Investigative Service (SIS) reports, Protective Custody investigations, etc.
      f. Memos, letters, etc., from courts, United States Attorneys' Offices, law enforcement officials, etc., relating to the referral;
      g. Any other information or intelligence related to the referral.
(Doc. 176-1, pp. 3-4).

7

*Id*. Ultimate approval for the CTU recommendation rests with the Chief of the BOP Counter Terrorism Unit. (Doc. 176-1, p. 5). According to Schiavone's declaration, "At the time of inmate Amawi's referral and review for designation to a CMU, Leslie Smith was the Chief of the Counter Terrorism Unit [.]" *Id*. Schiavone also notes that he would review the referral prior to delivering it to the Chief of the Counter Terrorism Unit. *Id*.

After issuing a recommendation, the CTU forwards the recommendation and supporting documentation to the BOP Office of General Counsel. (Doc. 176-1, p. 4). The Office of General Counsel reviews the packet of documents and will issue its own recommendation, which is then returned to the CTU. *Id*. The CTU then sends off the packet for final approval. When Amawi was placed in the CMU, final CMU placement authority rested with the appropriate regional director. (Doc. 176-1, p. 5). For Amawi, this was Michael Nalley, Regional Director of the North Central Region. *Id*. Schiavone states in his declaration that the CMU recommendation was also likely reviewed by the Senior Deputy Regional Director, Amber Nelson. *Id*. In 2015, final CMU placement authority was transferred away from the BOP Regional Director and now final placement authority rests with the Assistant Director of the BOP Correctional Programs Division. (Doc. 176-1, p. 4).

Amawi appears to have exhausted his BOP administrative remedies on July 22, 2013 (Doc. 1-1, p. 3) and he filed this lawsuit on August 21, 2013. (Doc. 1). In October of 2014 Amawi was transferred from the USP-Marion CMU to the United States Penitentiary in Lewisburg, Pennsylvania. (Doc. 149). Amawi was then transferred to the United States Penitentiary in Beaumont, Texas in February of 2016, where he currently resides. (Doc. 183).

## II. ANALYSIS

The defendants now seek summary judgment. Rule 56(a) of the Federal Rules of Civil Procedure states in part that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The defendants are seeking summary judgment and so we view the record in a light most favorable to Amawi and draw all reasonable inferences in his favor. *Rosario v. Brawn*, 670 F.3d 816, 820 (7th Cir. 2012). When presented with a motion for summary judgment, "the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.1994). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient [.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). To use the parlance of our times, this is the "put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).

Amawi proceeds on a two count complaint. In his first Count he asserts that the defendants violated his procedural due process rights under the Fifth Amendment. Amawi argues that he should have received additional procedural protections when he was selected for CMU placement, when his CMU status was periodically reviewed and when his requests for transfer were denied. The Supreme Court has noted that although a prisoner's "rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime." *Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S. Ct. 2963, 2974, 41 L. Ed. 2d 935 (1974). Under certain circumstances federal

prisoners are entitled to procedural due process protections under the Fifth Amendment. The Fifth Amendment states "No person shall … be deprived of life, liberty, or property, without due process of law [.]" When presented with a procedural due process issue, the Court makes the following two inquires; (1) "whether there exists a liberty or property interest which has been interfered with by the State" and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient [.]" *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908, 104 L. Ed. 2d 506 (1989).

Amawi's due process claim stems from the fact that not all prison environments are the same. Some units, such as prison disciplinary units (e.g., Special Housing Units or segregation units), impose much stricter restrictions on inmate life than general population units. The Supreme Court has held that inmates have a liberty interest in avoiding conditions of confinement that impose an "atypical and significant hardship [in] relation to the ordinary incidents of prison life [.]" *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 2300, 132 L. Ed. 2d 418 (1995). Because a liberty interest is implicated, a prisoner will be entitled to specific procedural due process protections if they are placed in such conditions. And of course "[i]n the absence of such "atypical and significant" deprivations, the procedural protections of the Due Process Clause will not be triggered." *Lekas v. Briley*, 405 F.3d 602, 608 (7th Cir. 2005).

Amawi argues that the conditions at the USP-Marion CMU constitute an atypical and significant hardship and he therefore should have received specific due process protections.[4] A recurring problem with prisoner due process claims, however, is that federal courts have not established clear, bright line standards for determining when prison conditions pose an atypical

---

[4] If Amawi's placement in the USP-Marion CMU did impose an atypical and significant hardship, Amawi would be entitled to procedural due process protections consisting of "advance written notice of the [decision], the chance to present testimony and documentary evidence to an impartial decisionmaker, and a written explanation, supported by at least "some evidence" in the record, for the [decision] taken." *Lagerstrom v. Kingston*, 463 F.3d 621, 624 (7th Cir. 2006).

10

and significant hardship. For this reason, the defendants assert that they are entitled to qualified immunity on Amawi's due process claim.

"Qualified immunity is an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (internal quote omitted). When addressing a qualified immunity issue, the Court conducts the following analysis:

> First, the court considers whether the officer in fact violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, the court asks whether the contours of the right were "sufficiently clear that a reasonable official would [have understood] that what he is doing violates that right." *Id.*, at 202, 121 S.Ct. 2151 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). [The Supreme Court] has rejected the idea that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.*, at 640, 107 S.Ct. 3034. Instead, the crux of the qualified immunity test is whether officers have "fair notice" that they are acting unconstitutionally. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002).

*Mullenix v. Luna*, 136 S. Ct. 305, 313–14, 193 L. Ed. 2d 255 (2015). The two prongs of the qualified immunity analysis may be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009) ("There are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right").

Proceeding directly to the second prong of the qualified immunity analysis, the Court agrees with the defendants in that there was not a clearly established liberty interest in avoiding

CMU placement during the time period in which Amawi was at USP-Marion. An inmate may have a liberty interest "if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh." *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009). This typically occurs when prisoners are placed in disciplinary segregation units, see *id.* at 698, (prisoner stated due process claim when placed in segregation for 240 days without a hearing), or "supermax" type facilities, see *Wilkinson v. Austin*, 545 U.S. 209, 223, 125 S. Ct. 2384, 2394, 162 L. Ed. 2d 174 (2005) (placement in Ohio state "supermax" prison triggered due process protections). Segregation and supermax units are generally characterized by strict limitations on yard time, educational/vocational opportunities and interaction among inmates. Inmates in those units are also often confined to their cells for the majority of the day. Except for the restrictions on outside communications and visits, the conditions in CMUs are similar to the general population units that exist in prisons across the country.

     Nevertheless, the CMU communication policies are unusual, and as such, the United States Court of Appeals for the Seventh Circuit has not yet had the opportunity to consider whether CMU placement implicates a liberty interest. Additionally, because CMUs are not quite analogous to segregation or supermax units, it cannot be said that BOP officials had "fair notice" that inmates placed in CMUs should be entitled to procedural due process protections. The defendants are therefore entitled to qualified immunity on Amawi's due process claim. It must also be noted that there have been recent developments in CMU related litigation. On August 19, 2016 the United States Court of Appeals for the District of Columbia Circuit held that CMU placement satisfied *Sandin*'s "atypical and significant hardship" standard, 515 U.S. at 484, 115 S. Ct. at 2300, thus triggering a liberty interest. *Aref v. Lynch*, 833 F.3d 242, 257 (D.C. Cir.

2016).[5] However, this does not affect the due process analysis for our case because the ruling was issued after Amawi's confinement in the CMU.

Next, Amawi argues in Count 2 of his complaint that the defendants violated his equal protection rights by designating him for placement in the CMU based on his race and religion (an Arab Muslim). In an affidavit attached to his response to the defendants' motion for summary judgment, Amawi asserts that:

- "Defendants Rivas, Kelly and Nuemann told [Amawi], 'As long as you live and serve your sentence you will never leave the CMU. We don't need any more Muslims in general population to radicalize anyone.'" (Doc. 190, p. 5, ¶ 2).
- "That Dodrill told Neumann, 'Amawi will never leave the CMU.'" *Id*. at ¶ 3.
- "That Defendants continued to tell [Amawi] that he would stay in CMU as long as he was a Muslim, and that was the real reason why [he] was designated to the CMU." *Id*. at ¶ 4.

Amawi then goes on to reiterate that the defendants discriminated against him not only in the initial CMU placement, but also when the defendants denied his repeated requests for a transfer. *Id*. at ¶ 5.

"[A]bsent a compelling state interest, racial discrimination in administering prisons violates the Equal Protection Clause [.]" *Black v. Lane*, 824 F.2d 561, 562 (7th Cir. 1987); see also *Johnson v. California*, 543 U.S. 499, 505, 125 S. Ct. 1141, 1146, 160 L. Ed. 2d 949 (2005).[6] The defendants do not appear to dispute that designating inmates for CMU placement on the

---

[5] In addition to the CMU due process discussion, *Aref v. Lynch*, 833 F.3d 242 (D.C. Cir. 2016) presents an enlightening analysis of ongoing issues with the Prison Litigation Reform Act.

[6] Prisoners in state prison are protected by the Equal Protection clause of the Fourteenth Amendment; federal prisoners' equal protection rights fall under the Fifth Amendment. The Supreme Court held that "[a]lthough [the Fifth Amendment] contains no Equal Protection Clause as does the Fourteenth Amendment, the Fifth Amendment's Due Process Clause prohibits the Federal Government from engaging in discrimination that is 'so unjustifiable as to be violative of due process.'" *Schlesinger v. Ballard*, 419 U.S. 498, 500, 95 S. Ct. 572, 574, 42 L. Ed. 2d 610 (1975) (quoting *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954)).

basis of their religion or ethnicity would violate the equal protection clause. The gist of the defendants' summary judgment argument is that the defendants' alleged to have made the aforementioned discriminatory remarks "had no role whatsoever in the decision to designate Amawi to the CMU." (Doc. 176, p. 13).

Borrowing a term from the field of employment law, see *Davis v. Wisconsin Dep't of Corr.*, 445 F.3d 971, 976 (7th Cir. 2006) (the same standards for proving intentional racial discrimination apply to Title VII and § 1983 equal protection claims), the defendants assert that the discriminatory statements were "stray remarks" that are insufficient by themselves to support an equal protection claim. The motion for summary judgment states that most of the named defendants had no personal involvement in the decision to assign Amawi to the CMU. The defendants argue that Michael Nalley, Regional Director of the North Central Region, had the final authority in regards to Amawi's CMU placement. When making that decision, Nalley reviewed the recommendations of Leslie Smith (Chief of the BOP Counter Terrorism Unit) and the BOP Office of General Counsel. The motion for summary judgment also notes that Defendants Amber Nelson (Senior Deputy Regional Director) and David Schiavone (Counter Terrorism Unit Senior Intelligence Analyst) also reviewed the recommendations for CMU placement. Because the actual CMU placement decision makers (Nalley, Smith, Nelson and Schiavone) did not make the discriminatory remarks, the defendants assert that Amawi cannot present a viable equal protection claim.

As the defendants correctly note, "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007) (overruled on other grounds by *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016)).

The stray remark standard holds particularly true in a prison environment. While derogatory or bigoted comments made by corrections staff serve no penological purpose and are inexcusable, realistically, the level of civility in a prison environment is likely to be far below one can expect in the typical non-prison workplace. However, such stray remarks can provide an inference of discrimination sufficient to survive a motion for summary judgment *if* the remark "was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse [decision]." *Id*. Here, however, none of the remarks were made by a decision maker. As such, Amawi has provided an insufficient evidentiary basis to survive summary judgment.

Amawi does make a general assertion in his affidavit; "That Defendants continued to tell the Plaintiff that he would stay in CMU as long as he was a Muslim, and that was the real reason why the Plaintiff was designated to the CMU." Id. at ¶ 4. But, many of the defendants worked at facilities other than USP-Marion, and other than this vague statement, there is no other evidence that they personally interacted with Amawi. "[A] party cannot defeat summary judgment by relying on unsubstantiated assertions [.]" *Greer v. Bd. of Educ. of City of Chicago, Ill.*, 267 F.3d 723, 729 (7th Cir. 2001).

It should additionally be noted that the defendants have taken a somewhat narrow view of the CMU discrimination claim by focusing on the stray remark / decision maker issue. In the employment law context, non decision makers may be held liable for discriminatory adverse decisions based on a "cat's paw theory" of liability. "[T]he cat's paw theory of liability applies when 'a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) (quoting *Matthews v. Waukesha Cnty.*, 759 F.3d 821, 828 (7th Cir.2014)). In the prison context, one could plausibly see a lower level correctional

15

officer issuing a pretextual disciplinary report or other adverse recommendation when the actual decision maker is a higher level official. With that said, Amawi has not presented any evidence that a "cat's paw" type sequence of events occurred, nor that there was any sort of conspiracy to keep him housed in the CMU.

## RECOMMENDATIONS

For these reasons, it is recommended that the defendants' motion for summary judgment be GRANTED.

SO RECOMMENDED

DATED:  **November 17, 2016.**

*s/ Reona J. Daly*
**REONA J. DALY**
**UNITED STATES MAGISTRATE JUDGE**